## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                               **Plaintiff,**<br><br>**vs.**<br><br>**TEAM RESOURCES, INC.,**<br>**FOSSIL ENERGY CORPORATION,**<br>**KEVIN A. BOYLES,**<br>**PHILIP A. DRESSNER,**<br>**MICHAEL EPPY,**<br>**ANDREW STITT,  AND**<br>**JOHN OLIVIA,**<br><br>                               **Defendants.** | **CIVIL ACTION NO.:**<br>3:15-CV-1045 |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Team Resources, Inc., Fossil Energy Corporation, Kevin A. Boyles, Philip A. Dressner, Michael Eppy, Andrew Stitt and John Olivia (collectively, "Defendants") alleges as follows:

## SUMMARY

1.      Between July 20, 2007 and at least April 12, 2012, Kevin A. Boyles and salespersons of various offerings—including Philip A. Dressner, Michael Eppy, Andrew Stitt and John Olivia (collectively, "Sellers")—raised more than $33 million from approximately 475 investors located throughout the United States.  These funds were raised via eight separate unregistered offerings of oil and gas limited partnership interests ("LP interests").   The LP interests were sold first through Team Resources, Inc. ("Team Resources") and later through Fossil

Energy Corp. ("Fossil Energy")—entities Boyles formed, owned, and controlled.  The defendants marketed the LP interests fraudulently by misrepresenting or failing to disclose material information about the offerings.

2.      The Defendants employed fundamentally the same blueprint to raise capital for the scheme.  First, Team Resources (and later Fossil Energy) acquired oil and gas leases in Kansas and placed them into limited partnerships in which Team Resources (and later Fossil Energy) was the managing general partner.  Boyles then prepared or directed the preparation of, and he and the Sellers distributed, offering materials promoting the LP interests and touting projected oil and gas production figures and investment returns.  The projections went far beyond what could reasonably be expected.  The Sellers utilized lead lists to cold call prospective investors located across the country.  Once the targeted sum was raised in a particular offering, Team Resources (and later Fossil Energy) hired third parties to drill the subject oil and gas wells.  The drilled wells uniformly failed to produce the volumes of oil or gas projected in the offering documents and by the Sellers, much less in commercially justifiable amounts.

3.      The Sellers comprised two groups.  One was an in-house staff based in Ventura, California that included Boyles and, for a period of time, Olivia.  The other was a group located in Hallandale Beach, Florida that included Dressner, Eppy, and Stitt.  In exchange for their sales efforts, the Sellers received undisclosed commissions ranging from 25% to 35% of the gross amounts raised from investors, although none of them were registered brokers, or associated with registered broker-dealers.

4.      The Defendants offered and sold investments in at least eight separate limited partnerships including:

        (a)      Kansas Select Gas & Oil Development Fund I, LP;

(b)     Natural Gas & Oil "Choice" Development Fund I, LP;

(c)     School Creek Production & Development Fund I;

(d)     School Creek-Walker Development & Pipeline Income Fund I, LP;

(e)     Nat Gas Pipeline Fund I, LP;

(f)     Grand Summit Fund I, LP;

(g)     Team Oil Income & Development Fund I, LP; and

(h)     Fossil Gammon Fund, LP.

5.      After the capital was raised for each of the offerings, Boyles provided periodic status updates on the progress of particular projects through letters and unique password-protected websites created for each of the offerings.  The updates were positive rather than disclosing the dismal state of the drilling operations, failures to meet projected oil and gas production across the offerings, and failures to pay projected investment returns.

6.      By August 2011, a number of investors began posting on the internet negative comments and reviews about Team Resources.  In response, Boyles created Fossil Energy to serve as the general partner of Fossil Gammon Fund, LP, the last of the eight offerings alleged herein.  In reality, Fossil Energy represented a change from Team Resources in name only.

## JURISDICTION AND VENUE

7.      Defendants offered and sold LP interests comprised of fractional undivided working interests in oil and gas wells, which investments constitute securities and investment contracts in accordance with Section 2(a)(1) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77b(a)(1)] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c(a)(10)].  The offerings of these investments were not registered with, or exempt from registration with, the Commission.

8.      The Commission brings this action under Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].  The Commission seeks the imposition of civil penalties pursuant to Section 20(d)(2)(C) of the Securities Act [15 U.S.C. § 77t(d)(2)(C)] and Section 21(d)(3)(B)(iii) of the Exchange Act [15 U.S.C. § 78u(d)(3)(B)(iii)].

9.      This Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t and 77v] and Sections 21and 27 of the Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u and 78aa] because Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce or the mails in connection with the transactions described herein.

10.      Venue is proper in this district under Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa] because certain of Defendants' acts, practices, transactions, and courses of business alleged herein occurred within this judicial district.

## **PARTIES**

11.      Kevin A. Boyles, age 48, resides in Ventura, California.  Boyles is the founder and sole owner, officer, and director to Team Resources and Fossil Energy.  Boyles is the architect behind the investment offering programs alleged herein.   He prepared or directed the preparation of the offering documents, controlled relevant bank accounts, sold LP interests to investors, and assembled and directed salespersons to sell the limited partnership units.  Boyles is not, and never has been, a Commission-registered broker, nor was he associated with a registered broker-dealer.

12.     Team Resources, Inc. was formed in September 2008 and is a California corporation headquartered in Thousand Oaks, California.  Boyles formed, operates, owns, and controls Team Resources, the managing general partner for the first seven investment programs alleged herein.  On November 26, 2012, Team Resources, without admitting or denying the allegations, consented to the entry of an Order by the New Hampshire Bureau of Securities Regulation ordering Team Resources to cease and desist from selling unregistered securities in that state for two years and  reimburse two investors a total of $12,500.

13.     Fossil Energy Corp. was formed in 2011 and is a California corporation headquartered in Thousand Oaks, California.  Boyles formed, operates, owns, and controls Fossil Energy, which acted as the managing general partner for the eighth investment program alleged herein.

14.     Philip A. Dressner, age 47, resides in Sunny Isles Beach, Florida. Dressner offered and sold LP interests in at least six of the offerings alleged herein, in exchange for which he received undisclosed commissions.  Dressner was not and never has been a Commission-registered broker, or associated with a registered broker-dealer.

15.     Michael Eppy, age 65, resides in Delray Beach, Florida.  Eppy offered and sold LP interests in three offerings alleged herein, in exchange for which he received undisclosed commissions.  Eppy was not and never has been a Commission-registered broker, or associated with a registered broker-dealer.  Eppy asserted his Fifth Amendment privilege against self-incrimination during the investigation that preceded this action.

16.     Andrew Stitt, age unknown, is a Canadian citizen. Stitt offered and sold LP interests in three of the offerings alleged herein, in exchange for which he received undisclosed

commissions. Stitt was not and never has been registered with the Commission as a broker-dealer, or associated with a registered broker-dealer.

17.     John Olivia, age 54, resides in Oxnard, California.  Olivia offered and sold LP interests in at least seven of the offerings alleged herein, in exchange for which he received undisclosed commissions. Olivia was not and never has been registered with the Commission as a broker-dealer, or associated with a registered broker-dealer.

## FACTS

### A.     BACKGROUND AND SUMMARY OF THE TEAM RESOURCES OFFERINGS

18.     Boyles has worked in and around the oil and gas industry since at least 1997.  He began using the d/b/a of Team Resources in 2002 and later formed it as a limited liability company in or around September 2008.  The company has served as managing general partner for numerous oil-and-gas-related limited partnerships in which investments were offered and sold to the public.

19.     From February 2007 through November 2011, Boyles created and operated seven separate oil and gas limited partnerships with Team Resources acting as the managing general partners.  Boyles and the Sellers raised nearly $29 million from hundreds of investors located throughout the United States:

Table 1 – Summary of the Seven Team Resources Investment Programs

| Partnership | Offering Period | Units Offered | Turn-key Unit Price | Total Offering | Investors | Amount Raised |
|---|---|---|---|---|---|---|
| Kansas Select Gas & Oil Dev. Fund I | 7/10/07 to 3/26/08 | 25 | $170,000 | $4,250,000 | 11 | $448,867 |
| Natural Gas & Oil "Choice" Dev. Fund | 8/01/07 to 7/30/08 | 50 | $59,000 | $2,950,000 | 60 | $2,779,446 |
| School Creek Prod. & Dev. Fund I | 5/01/08 to 1/29/09 | 75 | $82,500 | $6,187,500 | 109 | $5,998,310 |
| School Creek-Walker Development & Pipeline Fund | 10/01/09 to 10/18/10 | 75 | $97,500 | $7,312,500 | 103 | $7,858,845 |
| Nat Gas Pipeline Fund | 1/10/10 to 10/5/10 | 15 | $80,000 | $1,200,000 | 23 | $1,460,125 |
| Grand Summit Fund | 9/01/10 to 5/17/11 | 75 | $68,500 | $5,137,500 | 91 | $6,300,177 |

| Team Oil Income & Development Fund | 2/01/11 to 11/18/11 | 50 | $76,500 | $3,825,000 | 93 | $4,598,979 |
|---|---|---|---|---|---|---|

20.     Boyles oversaw, directed, and controlled every aspect of the Team Resources investment programs including:

- drafting offering documents, including a "Letter from the President" he signed;

- directing the creation and content of websites describing and promoting each offering;

- personally soliciting and selling interests to investors;

- directing or enabling others to solicit and sell interests to investors;

- providing investor leads to various sellers without first determining whether those investor leads were accredited investors;

- pricing turn-key units for investors;

- determining the amount to be raised for each program;

- promoting unrealistic production and investment returns;

- controlling the bank accounts for each program;

- communicating with investors about the progress of each project after completing each offering;

- forming Fossil Energy following the posting of negative investor opinions on the internet about Team Resources;

- paying undisclosed commissions to the Sellers; and

- using investor funds contrary to the language set forth in the offering materials.

21.     In undertaking these activities Boyles knew over time—or was at least severely reckless in not knowing—that, despite projections prepared by independent geologists and consultants, virtually all of the subject wells were drilled in an area in southeast Kansas known for shallow oil and gas formations where remaining hydrocarbons were, based on drilling

projects undertaken by others, either not recoverable or recoverable in such small, non-commercial volumes that would not produce oil or gas in the amounts projected.

22.     Over the years, and as he experienced the ongoing poor results of his investment programs, Boyles knew that the investment programs failed to come close to reaching the projected or investment return results.  Yet, as Boyles moved from one program to another, not only did he continue to rely on and publish unrealistic projections, based in part on information from geologists and consultants whose projections had proven unreliable, but he also failed to disclose the poor drilling results of previous programs.

**B.    THE SELLERS HELPED BOYLES CARRY OUT THE SCHEME.**

23.     Two separate sales staffs, located in California and Florida, promoted and sold the seven Team Resources offerings.  The California office included Boyles and Olivia.  The Florida office, under Dressner's direction, included Dressner, Eppy and Stitt (the "Florida Sellers").

24.     Neither Boyles nor any of Sellers were registered with the Commission as a broker or associated with a registered broker-dealer during the time of these activities.

25.     Boyles and the Sellers identified prospective investors through purchased lead lists, internet advertising, and websites dedicated to attracting individuals interested in oil and gas investments.  Boyles compiled the names of interested individuals identified through the lead lists and/or websites and placed them onto "lead sheets" he distributed to the Sellers in California and Florida, along with offering documents for each program.

26.     Team Resources' sales staff included "fronters" who initially contacted prospective investors.  If the investors expressed interest, then the Sellers would instruct Team Resources to send offering documents to the prospective investors.  Thereafter, "closers" contacted prospective investors to close the sale.  Olivia was a closer in California, who worked

closely with Boyles on all seven Team Resources' offerings.  Dressner, Eppy and Stitt were

closers in Florida who worked on many of the offerings.

### i.        The Florida Sellers Made Material Misrepresentations and Omissions

27.        The Florida Sellers operated under aliases.  Dressner offered and sold investments

in the Team Resources programs under the alias "Kevin Walker," while Eppy and Stitt offered

and sold investments in certain Team Resources programs under the aliases "Michael Bell" and

"Andy Belson," respectively.  The Florida Sellers did not disclose to potential investors that they

were using aliases.

28.        Dressner and Eppy created sales scripts for use by the Florida Sellers in

conversations with prospective investors, and which materially misrepresented Team Resources'

drilling success.  Dressner also created bogus invoices to disguise undisclosed commissions paid

to the Florida Sellers.  The purpose of these invoices was known to Boyles, and he paid the

invoices.

29.        The Florida Sellers used "pitch sheets" when contacting prospective investors.

Much of the information in the pitch sheets came directly from the Team Resources offering

documents, which had been prepared by Boyles.  The pitch sheets also included

misrepresentations that touted Team Resources' success with prior drilling operations.

30.        For example, the School Creek-Walker Development & Pipeline Income Fund

pitch sheet used by the Florida Sellers claimed that Team Resources had experienced "tremendous

success" in prior programs and currently had "over 60 wells successfully pumping in 5 different

states."  The pitch sheet also claimed that Team Resources was "expecting about one to three

million barrels of oil during this project" and that investors were "looking at a 20-30% return

annually with excellent tax benefits."  These statements were baseless and misleading.

31.     In connection with their offers and sales of LP interests in the Team Resources offerings, the Florida Sellers made unfounded and material misrepresentations about potential returns on investment, failed to disclose the nature of their association with Team Resources and Boyles, and failed to disclose that the Florida Sellers would be receiving commissions.

32.     In addition, the written offering materials in the Team Resources programs, and the scripts and pitch sheets used by the Florida Sellers, over-inflated oil and gas reserves and production and investment returns, none of which were reasonable given the nature of shallow oil and gas formations in the fields.  The Florida Sellers' material misrepresentations to investors included:

- Claims that the wells to be drilled would be between the two largest producing wells in the field;

- Claims that a new kind of drilling technology—radial jet drilling—would be used and had experienced an 85% success rate in Kansas;

- Promises that early investors would receive a 5% annual percentage rate on their investment when, in truth, such payments were made from the investors' own funds;

- Claims that Team Resources "had nothing but success" in prior drilling programs; and

- Claims that Team Resources currently had "over 60 wells successfully pumping" when, in reality, none of the wells were commercially successful.

33.     This information disseminated by the Florida Sellers, some of which was prepared or approved by Boyles, was materially false.

**ii.     Boyles Created, and He and the Sellers Disseminated, Misleading Offering Documents.**

34.     As stated above, Boyles created or directed the creation of the written offering materials for each of the seven oil and gas offerings sold through Team Resources.  These materials included an executive summary, Confidential Private Placement Memorandum

("PPM"), partnership agreement, investor suitability questionnaire, and subscription agreement describing the offering and forecasting investment returns (collectively, "offering documents").

35.     The offering documents claimed that the subject leases were located in fields in Kansas with proven oil and gas reserves where major oil companies had once drilled. Defendants failed to disclose to their investors that those same oil companies abandoned the region by the late 1960s after reported production levels declined to a point where it became commercially impractical for those major oil companies to continue production.

36.     The PPM and executive summary were the primary sales documents utilized throughout each of the seven offerings sold through Team Resources.

37.     Each executive summary included a signed letter from Boyles describing the relevant investment offering as a "balanced and diversified" program focused on recovering oil and gas from "proven producing fields." Boyles's letter went on to describe each program in geologic terms and provided photos and maps of well locations, existing nearby wells, drilling depths, and target zones. The letter also stated Boyles's performance expectations and forecasted returns on investment. For example, Boyles's letter included in the School Creek Production and Development Fund I executive summary stated:

> "Provided the wells perform in line with our expectations and we execute on our anticipated exit strategy after year five, the forecast ROI is 605% on cash for a total cumulative 931% return when the tax benefits are factored in."

38.     The PPMs were substantially similar in describing each of the seven Team Resources partnership operations, as well as the eighth offering conducted through Fossil Energy. Each PPM specified: (a) that partnership units were sold on a turn-key basis; (b) that a minimum offering amount had not been established; (c) the number of units in each program; (d) the price per unit for drilling, testing and completion of the wells; and (e) and the working interest and net

revenue interest acquired with each unit.  In addition, the offering documents: (a) described the management of the limited partnership; and (b) set forth the powers possessed by Team Resources as sole managing general partner such as the right to: (i) use offering proceeds upon receipt, and (ii) substitute drilling projects.

39.     Moreover, despite the use of investor suitability questionnaires, there were a significant number of investors in the Team Resources programs who were unfamiliar with the oil and gas industry, lacked experience investing in oil and gas transactions, and did not qualify as accredited investors.

### iii.     The Defendants Charged Investors for Turn-Key Interests.

40.     For all seven Team Resources offerings, the Defendants offered and sold limited partnership units to investors, which they described as turn-key interests—meaning that investors would make a one-time payment in exchange for an LP interest in a particular drilling program.

41.     Pursuant to the partnership agreement for each offering, Team Resources was solely responsible for the day-to-day operations of each limited partnership.

42.     According to the PPM for each offering, Team Resources was obligated to drill, test and, if necessary, complete the subject wells for a fixed price.  Team Resources would realize a profit to the extent that the fixed price exceeded the costs incurred by performing under the agreement.

43.     However, the Defendants failed to inform investors that the investments were priced such that Team Resources *always* realized a profit, and that the costs to drill the wells were much lower than the turn-key prices.

iv.     **Boyles and The Sellers Touted Unreasonable, Unsupportable Production Estimates Based on Misleading Claims of Proven Mineral Reserves.**

44.     The wells Team Resources drilled in five offerings described above were located in fields in southeast Kansas known for shallow oil and gas formations.  The wells drilled in the other two offerings were in Ford County, Kansas and Southern Louisiana.

45.     Nevertheless, the offering documents represented to investors that Team Resources acquired leases in "producing and productive underdeveloped fields" originally discovered by major oil companies where Team Resources would exploit the "proven under developed reserves."

46.     The Defendants represented to investors that they could expect considerable returns on their investments.  *See* Table 2, below.

47.     In reality, the subject fields had long before been depleted by other oil companies and few commercially recoverable hydrocarbons remained.  Nevertheless, Boyles continued to use third-party materials prepared which had been proven to be inaccurate in each prior offering. Predictably, once production began the oil and gas produced was far below projections.

48.     The Defendants distributed documents to investors claiming that Team Resources would "utilize a successful and proven technology called Radial Jet Enhancement, which improves and optimizes the production, efficiency and profitability."  The Florida Sellers claimed that radial technology had an 85% success rate in Kansas.  They failed to inform investors, however, that radial jet technology has never been proven to enhance production over an extended period and—although Team Resources did utilize the technology on certain wells in the Team Oil Income & Development Fund I, L.P. program—it ultimately did not enhance production.

v.       **The Defendants Projected Unreasonable Investment Returns.**

49.      In each of the seven Team Resources programs, the Defendants told investors they could expect to receive returns on their investment ranging from 20%–122% in the first year based on production from the wells to be drilled in each program.

50.      Beginning with Team Resources' Natural Gas Choice program, the Defendants began projecting even higher returns because they began including in their projections: (a) purported tax savings calculations; and (b) a future "exit strategy" for selling the subject wells. As a result, the Defendants assured investors in five investment programs that they would recoup their investment within two years:

*Table 2 – Annual Cash Flow Forecasts*

| Investment Program | Year 1 | Year 2 Cumulative | Year 3 Cumulative | Year 4 Cumulative | Year 5/Exit Cumulative |
|---|---|---|---|---|---|
| Kansas Select Gas & Oil Dev. Fund I | N/A | N/A | N/A | N/A | N/A |
| Natural Gas Choice Dev. Fund I | 100% | 169% | 224% | 252% | 272% |
| Nat Gas Pipeline Fund , LPI | 100% | 169% | 224% | 252% | 272% |
| School Creek Prod. & Dev. Fund I | 122% | 219% | 297% | 359% | 408% |
| School Creek-Walker Prod. & Pipeline | 20.56% | 44.76% | 76.52% | 106.09% | 146.47% |
| Grand Summit Fund I | 56% | 102% | 146% | 175% | 202% |
| Team Oil Inc. & Dev. Fund I | 58% | 99% | 130% | 157% | 180% |

51.      As the Defendants knew, Team Resources' first three investment programs provided only marginal returns.  Consequently, when the Defendants used these projections in 2010 and later, they knew or were reckless in not knowing that the projections were unrealistic. Unsurprisingly, Team Resources did not come close to meeting the projected returns.  In fact, in every one of Team Resources' seven limited partnership offerings, investors lost virtually all of their money.

52.     Based on Boyles's tenure and experience in the oil and gas industry and the breadth of publicly available information establishing that the selected drilling locations were long-depleted, Boyles knew, or was severely reckless in not knowing, that his early investment programs were not meeting the projections represented to investors.  Likewise, the Defendants knew, or were reckless in not knowing, that their representations and omissions of facts in communications with investors and prospective investors were materially misleading.

53.     Despite this, the Defendants continued to project lofty return for investors without disclosing the severe underperformance of earlier offerings.

vi.     **Team Resources and Boyles Promised to Pay Investors an Early Contribution Incentive Without Disclosing That it Was Funded by Investor Money.**

54.     In addition to enticing investors with promises of high returns, the Defendants also secured investments by promising to pay investors who invested early a "contribution incentive" at an annual rate of 5%–7.5% of invested capital from "the time of capital contribution until the commencement of Partnership drilling operations."

55.     This "early contribution incentive" began with the School Creek-Walker offering and was included in all subsequent Team Resources offerings and, later, the Gammon Fund offered through Fossil Energy.  Team Resources' PPMs and executive summaries claimed that Team Resources would escrow "non-partnership capital in a separate bank account" to pay the early contribution incentive.

56.     However, as Boyles knew, Team Resources did not establish separate escrow accounts for each offering as promised (although it did create some escrow accounts) and the incentive payments were funded largely by money received from investors.  These facts were not disclosed to investors.

### vii.   Boyles Agreed to Pay Undisclosed Commissions to the Sellers.

57.     The offering documents for each offering[1] claimed that commissions were not paid. In reality, Boyles paid the Sellers undisclosed commissions sourced largely from investor monies.

58.     Dressner received commissions on six of the Team Resources offerings, all but the Team Resources Grand Summit Fund I.  Eppy received commissions from Dressner in connection with his efforts to sell Team Resources' School-Creek Walker and Team Oil Income & Development Fund offerings, and the Florida Sellers' Grand Summit Oil Fund and Blackrock Gammon Fund.  Stitt was paid commissions by Dressner Team Resources' School-Creek Walker and Team Oil Income & Development Fund offerings, and the Florida Sellers' Grand Summit Oil Fund and Blackrock Gammon Fund discussed below.

59.     Boyles agreed to pay Olivia a commission.  He did so by paying Olivia in the form of a weekly or bi-weekly salary and, at the end of a year, paid Olivia a purported "bonus" that covered the difference between the purported salary and the entire sum of commissions earned that year, which amounted to 15% to 20% of the capital that Olivia raised.  This arrangement was not disclosed to investors.

60.     In total, Olivia received approximately $1.2 million for his participation in the sale of the oil and gas partnerships.

61.     Boyles agreed to pay Dressner 25%–35% of the capital raised by the Florida Sellers.  In turn, Dressner paid Eppy and Stitt commissions from the payments he received from Boyles.

62.     Dressner created and transmitted to Team Resources invoices that gave the appearance that Team Resources was compensating Dressner for supplying investor leads or for

---

[1] Including the eighth offering—the Gammon Fund—discussed in detail below.

providing marketing services.  This had the effect of concealing the commission payments.  The purpose of these invoices was known to Boyles, and he paid these invoices.

63.     Using aliases, Dressner, Eppy and Stitt set up shell companies to receive commission payments received from Team Resources.  In total, Dressner received $2,356,389 in commission payments, including over $2 million through three shell companies that Dressner owned and controlled, through which Dressner also routed $500,000 to his wife, despite the fact that she never performed any work for Dressner's shell companies, Boyles, or Team Resources.  Dressner also used these funds to pay commissions to Eppy and Stitt.  Eppy received commissions totaling $682,913.23.  Stitt received at least $214,371 in commissions.  Ultimately, Dressner retained $1,418,394 in commission payments.

64.     None of these facts were disclosed to investors.

**viii.    The Defendants Sold Investments in the Same Wells Across Different Partnerships and Charged Different Prices for the Same or Similar Interests.**

65.     The first two offerings—Kansas Select Gas and Oil Development Fund I and Natural Gas & Oil Choice Development Fund—were nearly identical programs formed to drill the same four wells: three in Ford County, Kansas and one in St. Martin Parish, Louisiana.

66.     The only substantive difference between the offerings was the price per unit charged to investors and the working interest percentage.  While investors paid $170,000 to obtain an LP interest in the Kansas Select, they paid $59,000 to obtain an LP interest in the Natural Gas Choice program.  The unit interest in the Natural Gas Choice program was one-quarter the size of the unit in the Kansas Select and represented a working interest that was one-quarter the size of the working interest in the Kansas Select.  Thus, the Natural Gas Choice investors received considerably smaller interests in the subject wells per dollar invested.

67.     Similarly, for Team Resources' sixth offering, the Defendants charged two different prices depending on who sold interests in the offering.  An interest purchased through Boyles's Team Resources California office for the Grand Summit Fund I, LP cost $68,500.

68.     An interest purchased in the same wells through the Florida Sellers in their Grand Summit Oil Fund I, LP cost $78,500.  The unit size of each offering was identical; the additional $10,000 represented a $10,000 markup charged by the Florida Sellers.

69.     There was no legitimate purpose for charging investors different prices for the same investments.  Rather, the difference was based simply on Boyles's and Dressner's agreement to increase the price charged per investment sold by the Florida Sellers in order to pay that office and its staff larger commissions.  Otherwise, the offerings were similar in all material respects.  This arrangement was never disclosed to investors or prospective investors.

### ix.     Boyles and Team Resources Used Investor Funds Contrary to the Language Set Forth in the Offering Materials.

70.     As noted above, the Defendants raised over $29 million from approximately 475 investors in connection with the seven Team Resources investment programs.

71.     At various times Boyles used funds raised for purposes contrary to what was represented to investors in the offering documents, including:

- Between November 2008 and March 2010, Boyles transferred $37,237 from Nat Gas Choice Development to Team's prior offering, the Kansas Select Gas & Oil; and

- In December 2010, Boyles transferred $900,000 from the School Creek-Walker Fund to repay loans from two individuals for a pipeline interest.

72.     Boyles and Team Resources did not disclose this to investors.  Ultimately, investors in the Team Resources offerings got back 5% or less of their investment principal.

     **x.**     **"New" Oil Field Discovery**

73.     In connection with the Grand Summit Fund—Team Resources' sixth investment offering—Team Resources reported discovery of a new oil field in Crowley County, Kansas. Boyles explained the supposed discovery in a signed letter distributed to investors and prospective investors, and in a press release included in the Grand Summit Fund's executive summary.

74.     In reality, Boyles did not discover a new field or even a new well location. Rather, Boyles characterized as a "new discovery" what—as he knew at the time he drafted the letter—was simply a well that had started to produce a small amount of oil and gas in a different field.

**C.     In the Face of Mounting Criticism Over The Failures of the Team Resources Offerings, Boyles Created and Sold Investments in Fossil Energy.**

75.     By summer 2011, only three of Team Resources' offerings had produced even marginal amounts of oil and gas.  And for each of those offerings, production was substantially below projections.

76.     Likewise, none of the investors in any of the first seven offerings had received investment returns approaching projections.  In fact, most investors had lost all or nearly all of the money they invested in the offerings.

77.     Unsurprisingly, investors in the Team Resources offerings grew increasingly dissatisfied and impatient as their investments failed to achieve the results projected by the Defendants.  Certain investors took to the internet to publish their complaints on blog sites.

78.     In or around July 2011, as negative public commentary grew, Boyles created Fossil Energy.  Fossil Energy differed from Team Resources in name only: it occupied the same office, was staffed by the same people, and engaged in the same business.

79.     On or around August 17, 2011, Boyles sent a letter to investors providing an "Introduction of Fossil Energy Corp & Appointment of Fossil as the new Managing General Partner of the Team Oil Income Development Fund I, LP."  In his letter, Boyles claimed Team Resources was winding down its management and development duties and passing them on to Fossil Energy, who would work with certain "industry partners" to assist Boyles and the limited partnerships in their "planned growth."  The letter stated that "[n]othing will change, only the company name."

80.     True to Boyles's August 2011 letter, nothing affecting the Team Resources limited partnerships changed following the formation of Fossil Energy.  Rather, Boyles formed another limited partnership oil and gas offering called the Gammon Oil Fund I, LP ("Gammon Oil Fund"), in which Fossil Energy served as the managing general partner.

81.     The Gammon Oil Fund PPM was prepared less than a month after Boyles's letter first announced Fossil Energy's formation.

82.     Through the Gammon Oil Fund offered and sold between September 8, 2011 and March 20, 2012, Boyles sought to sell up to 50 LP interests at a price of $80,000 each, for a total offering of $4,000,000.  The stated purpose of the Gammon Oil Fund limited partnership was to acquire a fractional undivided working interest in four wells to be drilled on the Gammon lease in Cowley County, Kansas—the same geographic area Boyles used in five of seven prior underperforming investment offerings.

83.     In Fossil Energy's efforts to sell interests in the Gammon Oil Fund, Boyles distributed offering documents stating that cash flow projections were "based on previous drilling experience of the management of the Managing General Partner for the purpose of

illustrating the effect of the investment in the Wells."  However, the offering documents failed to disclose that the prior offerings had uniformly failed to meet expectations.

84.     As Boyles was launching Fossil Energy and the Gammon Oil Fund, Olivia left Team Resources to form Paramount Energy Group, Inc. ("Paramount").  However, Olivia moved across the hall of the building where Boyles and Team Resources operated and continued to have full access to Team Resources' computer server and the two entities shared the same phone system.

85.     Olivia created a separate PPM and other offering documents through which he and Paramount offered and sold investments in the Paramount Gammon Oil Development, LP ("Paramount Gammon"), another oil and gas investment program intended to acquire partial working and net revenue interests in the *very same* four wells offered by Fossil Energy.

86.     Hence, unbeknownst to investors, investment interests in the same lease were offered and sold through Paramount Gammon and the Gammon Oil Fund programs.  In selling the same interests, Boyles agreed to pay Olivia a 30% commission on all sales Olivia made, with the remainder of investment monies—after expenses—being applied to drill the subject wells. Investors were never told that part of their money invested in Paramount Gammon would be used to pay commissions to Olivia.

87.     Between September 15, 2011 and February 1, 2012, Olivia raised $560,000 from investors through his Paramount Gammon program.  After deducting Olivia's undisclosed 30% commission and paying certain office expenses, Boyles directed Olivia to send the remaining $383,817 directly to the drilling operator.

88.     The Florida Sellers also raised investment funds for the same Gammon field wells as the Gammon Oil Fund and Paramount Gammon.  To do this, Dressner formed Blackrock

Energy Group, Inc. ("Blackrock Energy") in or around June 2011.  Instead of using his own

name on the corporate documents, Dressner caused an employee to serve as Blackrock Energy's

sole officer and to open a corporate bank account.  Dressner then obtained a facsimile signature

stamp he used to transfer investor funds to several accounts he controlled.

89.     Dressner also formed Blackrock Gammon Oil Fund I, LP ("Blackrock

Gammon").  Like the Paramount Gammon fund, the Blackrock Gammon fund's objective was to

acquire partial working and net revenue interests—once again—in the *very same* four wells to be

drilled by in connection with the Gammon Oil Fund and Paramount Gammon programs. The

Florida Sellers, acting through Blackrock Gammon, raised at least $2 million from 55 investors

between August 24, 2011 and March 21, 2012.

90.     Similar to the Gammon Oil Fund offering documents, the offering documents

used for the Paramount Gammon and the Blackrock Gammon offerings made bold,

unsubstantiated cash flow projections which they claimed were based on management's previous

drilling experience:

*Table 3 -- Summary of the cash flow estimates for the three Gammon offerings:*

| Investment Programs | Year 1 | Year 2 Cumulative | Year 3 Cumulative | Year 4 Cumulative | Year 5/Exit Cumulative |
|---|---|---|---|---|---|
| Gammon Oil Fund I | 59% | 109% | 149% | 180% | 316% |
| Blackrock Gammon Oil Fund I | 58% | 109% | 153% | 188% | 343% |
| Paramount Gammon Oil Fund I | 56% | 102% | 140% | 169% | 297% |

91.     The offering documents for the Gammon Oil Fund, Paramount Gammon, and

Blackrock Gammon investment programs each independently purported to sell up to 50 LP

interests in three separate partnerships—in an apparent attempt to raise a total of up to $12.35

million.  Each of the three funds claimed to be raising up to 75% of the working interest in the

four Gammon wells.  Consequently, the funds were offering to sell a combined 225% working interest (and a 168.75% net revenue interest) in the same wells.

92.     Collectively, Fossil Energy, Paramount, and Blackrock Energy raised over $3 million from 73 investors between August 25, 2011 and April 5, 2012: Gammon Oil Fund raised $1,133,440; Paramount Gammon raised $560,000; and Blackrock Gammon raised $2,094,826.

93.     Boyles only drilled three of the four promised wells described throughout the Gammon Oil Fund, Paramount Gammon, and Blackrock Gammon offering documents.

94.     None of these facts were disclosed to investors, and—as with previous offerings—oil and gas production and investment returns to investors failed to meet the projections made in representations to investors.

## FIRST CLAIM FOR RELIEF
### Violations of Section 17(a) of the Securities Act
### by Team Resources, Fossil Energy, Boyles, Dressner, Eppy, and Stitt

95.     The Commission re-alleges and incorporates paragraphs 1 through 94 by reference as if fully set forth herein.

96.     The Defendants each directly or indirectly, singly or in concert, in the offer and sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, have (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit upon the purchasers of securities.

97.     By reason of the foregoing, these Defendants, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by Team Resources, Fossil Energy, Boyles, Dressner, Eppy, and Stitt

98.     The Commission re-alleges and incorporates paragraphs 1 through 94 by reference as if fully set forth herein.

99.     The Defendants each directly or indirectly, singly or in concert, in connection with the purchase and sale of securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange, have: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operate or would operate as a fraud or deceit upon other persons.

100.    By reason of the foregoing, these Defendants, singly or in concert, directly or indirectly, have violated and, unless enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## THIRD CLAIM FOR RELIEF
### Violations of Section 5(a) and 5(c) of the Securities Act by all Defendants

101.    The Commission re-alleges and incorporates paragraphs 1 through 94 by reference as if fully set forth herein.

102.    The Defendants, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in interstate commerce, or the mails, to

offer and sell securities when no registration statements was filed or in effect as to such securities and when no exemption from registration was applicable.

103.    By reason of the foregoing, Defendants have violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c).]

## FOURTH CLAIM FOR RELIEF
### Violations of Section 15(a) of the Exchange Act by Boyles, Dressner, Eppy, Stitt and Olivia

104.    The Commission re-alleges and incorporates paragraphs 1 through 94 by Reference as if fully set forth herein.

105.    Boyles, Dressner, Eppy, Stitt and Olivia have each acted as brokers within the meaning of the Exchange Act and have made use of the means or instruments of transportation or communication in interstate commerce, or the mails, to effect transactions in securities or to induce or attempt to induce the purchase or sale of securities without being registered in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

106.    By reason of the foregoing, these Defendants have violated and, unless enjoined, will continue to violate Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## PRAYER FOR RELIEF

Based on the foregoing, the Commission respectfully requests that the Court enter a Final Judgment:

(a)     Finding that Defendants each violated the securities laws as alleged

        herein;

(b)     Permanently restraining and enjoining [Defendants], and their officers,

        agents, servants, employees, attorneys, and all other persons in active

        concert or participation with them, who receive actual notice of the Final

        Judgment, by personal service or otherwise, and each of them, from

violating Section 17(a) of the Securities Act [15 U.S.C. §§ 77e and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(c)      Permanently restraining and enjoining Defendants, and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, who receive actual notice of the Final Judgment, by personal service or otherwise, and each of them, from violating Sections 5 of the Securities Act [15 U.S.C. §§ 77e];

(d)      Permanently restraining and enjoining Boyles, Olivia, Dressner, Eppy and Stitt, and their officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, who receive actual notice of the Final Judgment, by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

(e)      Ordering Defendants to disgorge, singly or jointly and severally, their ill-gotten gains received as a result of their violations of the federal securities laws and to pay pre-judgment interest thereon;

(f)      Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

(g)      Granting such other and further relief to the Commission as this Court may deem just and proper.

Dated: April 6, 2015

Respectfully Submitted,

_____

Chris Davis
Texas Bar No. 24050483
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, Texas 76102
(817) 900-2638
(817) 978-4927 (fax)
davisca@sec.gov