IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>TEAM RESOURCES, INC.,<br>FOSSIL ENERGY CORPORATION,<br>KEVIN A. BOYLES,<br>PHILIP A. DRESSNER,<br>MICHAEL EPPY,<br>ANDREW STITT, AND<br>JOHN OLIVIA,<br><br>Defendants. | CIVIL ACTION NO.:<br>3:15-CV-1045-N<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANT MICAEL EPPY'S OPPOSITION
TO PLAINTIFF'S MOTION FOR REMEDIES**

Defendant Michael Eppy respectfully responds to Plaintiff Securities and Exchange Commission's Motion for Remedies and Entry of Final Judgment (Dkt. 42). In its motion, the SEC acknowledges that the Court has broad discretion to impose the remedies of disgorgement, prejudgment interest and penalties. In exercising its discretion, Defendant Eppy requests the Court to consider Eppy's limited role in the alleged scheme, the non-scienter charges to which Eppy and the SEC have agreed to in this case, Eppy's age and personal circumstances, and Eppy's conduct relative the other defendants in this matter. Eppy urges the Court to tailor financial remedies as to Eppy that are just and equitable in light of the facts and arguments set forth below.

1

## I. PROCEDURAL HISTORY

The SEC brought this action in April 2015, alleging that Team Resources, Inc. (and later Fossil Energy Corporation) offered oil and gas limited partnership interests to investors in eight separate offerings between in July 2007 and April 2012. (Complaint ¶ 1). Collectively, the offerings raised approximately $33 million from 475 investors in the United States. (*Id.*). At all times, Defendant Kevin Boyles controlled every aspect of Team Resources' investment program. (*Id.* ¶ 20).

Eppy was a telemarketer who offered and sold limited partnership interests in *three* of Team Resources projects. Complaint ¶¶ 1, 15. The SEC alleged that Eppy, who was not a licensed securities broker, received undisclosed commissions in the amount of $682,913.23 and used an alias in communicating with investors. The SEC alleged that Eppy's conduct violated the antifraud, registration and licensing provisions of the federal securities laws. (Complaint ¶¶ 15, 63).

During discovery, Eppy produced documents to the SEC and provided deposition testimony.[1] Following discovery, Eppy and the SEC engaged in settlement discussions, which resulted in the SEC dropping its scienter-based fraud charges against Eppy. (Motion for Remedies at 3, n.1). Eppy now stands alone as the only defendant in this action that did not consent to any scienter-based violation.[2]

---

[1] Eppy asserted his Fifth Amendment privilege during the underlying investigation of this matter. (*See* Declaration of Richard Zadina, Dkt. 48, ¶ 4, n.1). However, during discovery, Eppy withdrew his Fifth Amendment assertion and produced information to the SEC, including deposition testimony.

[2] Significantly, Eppy did not consent to a violation of the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

The SEC has now moved for entry of a final judgment that orders Eppy to disgorge ill-gotten gains of $723,263.23, plus prejudgment interest of $114,542.94, and a civil penalty in an amount to be determined by the Court.

## II. FACTS[3]

1. Eppy is 68 years old and resides in Delray Beach, Florida. (App. at 3, 15).[4] Eppy graduated from New York University in 1971 with a Fine Arts degree. (App. at 3).

2. Since the commencement of this case, Eppy has been unemployed. (App. at 4, 15, 20). In addition, his wife of 29 years and only son passed away. Eppy has been in a state of shock and grief. (App. at 20).[5]

3. Eppy worked with Phillip Dressner between approximately August 2010 and the first quarter of 2012. (App. at 13). Eppy's work related to the marketing of three oil and gas offerings on behalf of Team Resources. (App. at 17; Complaint ¶ 15). The specific offerings included Team Oil and Income, Grand Summit and Blackrock Gammon. (App. at 9). Eppy had never worked with Boyles or Dressner prior to August 2010, and has not worked with them since the commencement of this action. (App. at 15).

---

[3] The SEC points out its motion that by entering a consent judgment, Eppy is prohibited from arguing that he did not violate the federal securities laws and admits the allegations in the Complaint solely for purposes of the SEC's motion. (Motion at 2). The facts described herein are not intended to challenge the allegations in the Complaint; they are presented to give context to Eppy's argument regarding the imposition of financial remedies against him.

[4] Eppy attaches an Appendix to this response, which includes true and correct excerpts of his deposition transcript in this case.

[5] When asked about future employment, Eppy testified: "I plan to come through this process of what I'm experiencing, and I don't know what's in store for me. I'm going to be real blunt with you. I don't know. I lost my son five years ago to an overdose. And I was kind of preparing myself for that. And I was not prepared for my wife's passing, so I'm a little in shock. And the – my motivations are changing as I'm getting older, and I don't know." (App. at 20).

4. Eppy met Dressner in 2010 when Eppy responded to an advertisement in the newspaper for a telemarketer position. (App. at 6). Dressner told Eppy that Team Resources generated leads of individuals who wanted information regarding an oil and gas investment, and that Dressner needed people to call the leads. (*Id.*). Dressner told Epply that "he'd been working with this company for a period of time. It was up and running, it was successful. It was very good." (*Id.*).

5. Eppy asked Dressner whether he needed to obtain a license to market the Team Resources projects. Dressner told him, "No, you don't. I have an agreement with Team and we've been doing this eight years and everything's great and that's why I'm advertising in the paper." (App. at 18).

6. Eppy conducted due diligence on Team Resources, Kevin Boyles and Phillip Dressner. Eppy testified:

> I did a Google search on Team Resources. I did a Google search on Kevin Boyles. And I also reviewed the website, in which there was a video interview with Kevin Boyles, and he was being interviewed by Alexander Haig . . . .
>
> And I didn't see any red flags. I think I typed in "complaints against Team Resources" or "complaints against Phil Dressner." . . . . [T]here was nothing negative. And the way it was presented to me, it had been doing business for seven or eight years, and there was no problems and everything's great. So for lack of any bad comments or any comments, I said, okay, let's go forward. (App at 10, 16).

7. Eppy visited the Team Resources offices in California. "I observed a business, a conference room, with a conference table. I observed secretaries. I observed people – women at desks. I was greeted by Mr. Boyles. The name of the company was on the door. It was furnished nicely. It consisted of a few different offices . . . I saw a few people working on the phone there, men, for the most part, three, or four, or five, I

think. And I observed what looked to me like an up and running business." (App. at 17). Additionally, Eppy testified: "I was informed that Mr. Boyles' attorney was a reputable attorney, a respected attorney, who used to work for the Securities and Exchange Commission, which I was very comforted by . . . [The offering documents] appeared to be professionally done. It appeared to be legitimate. And it appeared to be legal." (*Id.*).

8. Eppy described the work he performed for Dressner as follows: "He supplied me with names and phone numbers to call on people that had . . . requested information regarding the offers from Team Resources. And I was asked to contact with them, see what their interest level was, see if they were suitable, in terms of qualifications, in terms of interest level, and if they were, then . . . Team Resources would send out a package to them. And . . . after they received the package, then they would get a phone call back and I would facilitate answering, and if they had specific questions regarding the documentation and the package, discuss that with them." (App. at 4-5). Eppy simply "reiterated what was in the paperwork." (App. at 8).

9. Eppy did not draft or edit any of the offering documents. (App. at 18). The offering material was created and sent to potential investors from Team Resources offices in California. (App. at 19-20).

10. Eppy acknowledges that he used the alias of "Michael Bell" when he marketed the Team Resources projects to investors. (App. at 11). Dressner told Eppy to use an alias because "if there's ever a problem, a disgruntled employee, you don't want your name – personal name going up in the Internet and having to deal with that . . . ." (*Id.*).

5

11. Dressner paid Eppy a commission for marketing the Team Resources projects to investors. (App. at 6, 13). Eppy testified that he did not tell investors that he was getting paid a commission because the issue "never came up." (App. at 8). Eppy further testified that had "no idea" why commissions were not disclosed in Team Resources' offering documents. (App. at 12).[6]

### III. ARGUMENT

**A. The SEC's Calculation of Disgorgement Erroneously Includes "Commissions" In An Offering That Was Not Alleged in the Complaint.**

The SEC questioned Eppy at his deposition about a "capital raise" that Dressner initiated in 2012 in order to expand his Florida operations. (App. at 22). In essence, Dressner was issuing promissory notes to investors presumably in return for an interest payment of 18%. (*Id.*). Eppy testified that it was "something completely different" than the work he was performing for Team Resources. (*Id.*). Eppy testified that he did not have "a good feeling about the note," but offered and sold a handful of notes to investors who had invested previously in Team Resources. (*Id.*). Eppy testified further: "So shortly after I started working with him on that, I said, 'I'm not interested in doing this. I don't want to do it.'" (*Id.*).

Dessner's capital raise is not alleged in this lawsuit. The summary chart offered by the SEC, however, includes what appears to be payments to Eppy in connection with the capital raise. Specifically, between March 14, 2012 and May 13, 2012, Eppy received payments from Dressner's "Blackrock Energy" account (JP Morgan) in the total

---

[6] The SEC alleges generally that the "Sellers" received undisclosed commissions ranging from 25% to 35% of the gross amounts raised from investors. While that percentage range may be accurate for Dressner, Eppy received 12.5% to 15% as commissions on the projects he worked. (App. at 25).

amount of $49,775.[7] Four of the entries from this account make reference to "Promiss. Note," "P.N.," "Pr. Note," or "Prom. Note" in the "Memo" column.

Accordingly, Eppy requests that the Court exclude $49,775 from the disgorgement calculations offered against him by the SEC.[8]

### B. Reimbursed Business Expenses Should Not Be Included in the Disgorgement Calculation.

The summary chart includes three payments from Dressner to Eppy for what appear to be business expenses that total $10,000. The "Memo" column on the chart refers to these payments as "Trip" and "B. Trip." In other words, these payments do not relate to "undisclosed commissions" as alleged generally in the Complaint. Eppy does not quarrel with the SEC's statement of the law that business expenses normally should not be offset from the calculation of disgorgement (Motion at 5). But here, the expense belonged to Dressner. Dressner, presumably, should be precluded from arguing that the $10,000 payment to Eppy should be offset from Dressner's disgorgement amount.

Because these payments from Dressner to Eppy to not appear to be for "undisclosed commissions," they should not be included in the calculation of disgorgement. Accordingly, discounting the capital raise and the expense reimbursements from the SEC's disgorgement figure as stated in the motion ($723,263.23), Eppy's potential disgorgement should not exceed $663,488.23.

---

[7] Blackrock Energy is not one of the three offerings that Eppy worked on. (*See* App. at 9).

[8] The SEC's evidence in support of its disgorgement calculations is vague. The Zadina Declaration simply states that the summary chart includes all "amounts as a result of participating in the securities offerings that are the subject of this case." Motion App. ¶ 5, Ex. 4 (Eppy Chart). The SEC does not make clear that the "amounts" relate to payment of undisclosed commissions or expenses, and certainly include "amounts" that do not relate to the allegations in the Complaint.

**C.  The Court Has Broad Discretion in Considering the Financial Remedies Requested by the SEC.**

The SEC correctly states that the Court has "broad discretion" is determining the amount of disgorgement, prejudgment interest and civil penalties for violations of the federal securities laws. (Motion at 4-7). Here, Eppy urges the Court to consider Eppy's conduct in relation to the other defendants and adjust downward the total amount of disgorgement sought by the SEC.

The record shows that Eppy started working with Dressner more than four years after Boyles initiated the alleged fraudulent scheme, and participated in only three of the eight fraudulent offerings alleged in this case. Eppy had no pre-existing relationship with either Boyles or Dressner, and certainly would not have joined the alleged scheme as a telemarketer if he had reason to believe that the Team Resources projects were not legitimate. When Eppy suspected that something might be amiss with Dressner's "capital raise," he stopped working for Dressner and stopped marketing the Team Resources offerings. Eppy concedes, as he must, that he used the alias of "Michael Bell" at the suggestion of Dressner in communications with investors, and he did not obtain a "license" to market the investment because Dressner told him it was not necessary, and he failed to disclose to investors he was paid a commission. But Eppy's conduct, as the SEC notes in its motion, was unreasonable under the circumstances, not "knowingly." (Motion at 3). In other words, the SEC ultimately treated Eppy differently than the other defendants. He is the only defendant in this action that did not consent to a scienter-based charge.

In contrast, Defendant Boyles began raising money in unregistered oil and gas offerings since February 2007 (Complaint ¶ 19), more than four years before Eppy

8

responded to the newspaper ad and joined Dressner's efforts to market Team Resources projects. Eppy was not a ringleader or architect of the alleged scheme; he was a telemarketer. It was Boyles who allegedly "oversaw, directed, and controlled every aspect of the Team Resources investment programs." (Complaint ¶ 20). Boyles created the programs and the offering material, promoted "unrealistic production and investment returns," paid commissions to telemarketers without making adequate disclosure in the offering documents, and used investors funds contrary to the representations in the offering material. (*Id.*). Eppy played to no role in these activities, and there are no allegations that he did. Boyles reaped massive gains for his conduct (approximately $30 million) and Dressner received approximately $2,278,710 for his role in the alleged scheme. (Motion at 4).[9]

Eppy was used as a pawn in Boyles alleged scheme. He needed a job; he performed due diligence on Boyles, Team Resources and Dressner before making a decision to market the Team Resources projects; he visited Team Resources' operations in California and reviewed the offering material, which did not give him cause to be concerned. He asked Dressner whether he needed a license to market the offerings, and Dressner gave him an erroneous answer. Eppy marketed the projects using the material that Boyles apparently created, and did not know that the information that Boyles had disseminated to investors included material misstated facts.

Despite the obvious differences between Boyles, Dressner and Eppy, the SEC seeks the return of all the payments made to him by Dressner. He is being treated no

---

[9] Dressner allegedly received 25% to 35% from the Team Resources offerings. In turn, he paid Eppy commissions of 12% to 15%. If Dressner is required to disgorge all of the payments he received from Team Resources, then his disgorgement obligation effectively covers all of the funds that he gave Eppy. It is not necessary to order Eppy to disgorge the funds he received if those funds are already included in Dressner's calculation.

differently than the other defendants, who consented to scienter-based fraud charges. Eppy urges the Court to consider his age, his personal circumstances, and his relative role in the alleged scheme in determining a just and equitable amount of disgorgement and prejudgment interest.

With respect to penalties, Court's often consider (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

Eppy does not contest the fact that Boyles alleged scheme was egregious, transpired over the course of many years, and likely caused significant losses to investors. But Eppy's conduct was far less egregious, he did not violate any scienter-based securities laws, and his conduct was relatively isolated in comparison to the totality of Boyles' scheme. Had Boyles made appropriate disclosures in his offering documents, Eppy may not have been wrapped up in this action. In consideration of the factors commonly used in securities cases, Eppy urges the Court not to impose a penalty against him, or alternatively, to impose a First Tier penalty of $7,500 for his conduct.

## **CONCLUSION**

For the reasons stated herein, Eppy urges the Court to exercise its discretion by imposing just and equitable financial remedies against Eppy that take into consideration his conduct relative to the other defendants who orchestrated the alleged scheme.

Because of the amounts of financial remedies sought against Eppy, Eppy respectfully requests oral argument in this matter.

Dated:  March 21, 2017                                  Respectfully,

                                                        */s/ J. Kevin Edmundson*

                                                        J. Kevin Edmundson
                                                        EDMUNDSON PLLC
                                                        Bar No. 24044020
                                                        21209 Highway 71 West, Suite 3
                                                        Spicewood, Texas 78669
                                                        (512) 720-0782
                                                        kevin@edmundsonpllc.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on March 21, 2017, he electronically filed Defendant Michael Eppy's Opposition to Plaintiff's Motion for Remedies with the clerk of court via CM/ECF, which will send a notice of electronic filing to all counsel of record.  The undersigned also certifies that sent by electronic mail a copy of the foregoing to all counsel of records.

                                                        */s/ J. Kevin Edmundson*